UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

PATRICK CONKLIN,

       Plaintiff,

    -v-                                       No.   1:20-CV-08178-LTS

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, ALEJANDRO
MAYORKAS,

        Defendants.

--------------------------------------------------------x


<u>OPINION AND ORDER</u>

APPEARANCES:

| BALLON, STOLL, BADER & NADLER PC. | UNITED STATES ATTORNEY'S OFFICE, SOUTHERN DISTRICT OF NEW YORK |
|---|---|
| By:  Edward Michael Tobin, Esq. | By:  Jessica F. Rosenbaum, Esq. |
|      Monika Karolina Olowska, Esq. | 86 Chambers Street |
|      Marshall Benjamin Bellovin, Esq. | New York, NY 10007 |
| 729 Seventh Ave., 26th Flr. | |
| New York, NY 10019 | |
| *Attorneys for Plaintiff* | *Attorneys for Defendant* |

LAURA TAYLOR SWAIN, Chief United States District Judge

Plaintiff Patrick Conklin ("Plaintiff" or "Conklin") brings this action against Defendants U.S. Immigration and Customs Enforcement ("ICE") and United States Secretary of Homeland Security Alejandro Mayorkas ("Mayorkas") (collectively, the "Defendants"),[1] asserting claims under the Rehabilitation Act of 1973 (the "Rehabilitation Act" or "RA"), 29 U.S.C. §§ 701 et seq., for discrimination based upon disability, failure to accommodate, retaliation, and hostile work environment, based on events that allegedly occurred while Plaintiff was employed by ICE, between 2015 and 2020.  (Docket entry no. 23 ("Amended Complaint" or "AC").)  The Court has jurisdiction of Plaintiff's Rehabilitation Act claims pursuant to 28 U.S.C. section 1331.

Defendants have moved for summary judgment as to all claims, and Plaintiff opposes the motion.  (See docket entry nos. 56 (the "Motion for Summary Judgment"), 66 ("Pl. Mem.").)  The Court has considered the submissions of the parties carefully and, for the reasons explained below, has reached the following conclusions.  As to Plaintiff's first (discrimination based on disability) and fourth (failure to accommodate) causes of action, the Motion for Summary Judgment is granted.  As to Plaintiff's second cause of action (hostile work environment), the Motion for Summary Judgment is denied.  As to Plaintiff's fourth cause of action (retaliation), the Motion for Summary Judgment is granted in part and denied in part.

---

[1]     On March 29, 2021, Plaintiff voluntarily dismissed without prejudice claims brought against Defendants Franz Jeudy, Scott Mechkowski, Darius Reeves, William Joyce, Thomas Decker, Jeffrey Berndt, and Joseph Harrington, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).  (See docket entry nos. 24, 25.)

<u>BACKGROUND</u>

The following facts are undisputed unless otherwise indicated.[2]  Plaintiff is a former deportation officer for ICE.  He was hired by ICE on September 20, 2015.  (Docket entry no. 58 ("Defs. 56.1 St.") ¶¶ 1-2.)  On or around February 2016, following graduation from academy training, Plaintiff was assigned to the Removal Coordination Unit, located at 201 Varick Street in New York, New York.  (<u>Id.</u> ¶ 11.)  At 201 Varick Street, he was supervised by Supervisory Deportation and Detention Officer ("SDDO") Thomas Flynn ("Flynn"), and worked the midnight – 8 a.m. shift.  (<u>Id.</u> ¶ 9.)  At his deposition, Plaintiff stated that, at some point, he orally disclosed to Flynn that he has a mood disorder.  (<u>See</u> docket entry no. 59-5 ("Conklin Dep.") at 110:09-18 ("Q. I am asking before . . . August 16th, 2017, what evidence do you have that any of your supervisors, anybody was aware of your disability?  A. Flynn was aware.  Q. Okay. How was Flynn aware? A. When I was going out I had to ask him for leave . . . I don't remember exactly what the disclosure was, but I remember disclosing to him I have a mood disorder and I take medication.").)  Plaintiff does not claim that Flynn disclosed his disorder to any other supervisor.

In April 2016, Plaintiff requested a shift change, and in December 2016 he began working the 8 a.m. - 4 p.m. shift under SDDO Gabriel Hoke.  (Docket entry no. 67 ("Pl. 56.1 Counter-St.") ¶ 11.)  In September 2016, he received a standard performance grade promotion to 9, and received his first performance review, which rated him as "highly successful." (<u>Id.</u> ¶¶ 12-

---

[2]     Facts characterized as undisputed are identified as such in the parties' Local Civil Rule 56.1 statement and counterstatement or drawn from evidence as to which there has been no contrary, non-conclusory factual proffer.  Citations to the parties' Local Civil Rule 56.1 statement and counter-statement (<u>see</u> docket entry no. 58 ("Defs. 56.1 St.") and docket entry no. 67 ("Pl. 56.1 Counter-St")) incorporate by reference the parties' citations to underlying evidentiary submissions.

13.)  In December 2016, Plaintiff twice requested a transfer to ICE's Newburgh sub-office (the "Newburgh Office"), for the stated reason that it was closer to his home.  (Id. ¶¶ 14-15.)  Neither request mentioned Plaintiff's disability or suggested any basis for the request aside from a shorter commute.  (Id.)

In January 2017, Plaintiff received a seniority-based reassignment to the Non-Detained Unit ("NDU") at 26 Federal Plaza, pursuant to a bargaining agreement covering Enforcement and Removal Operations employees, including Plaintiff.  (Defs. 56.1 St. ¶ 16.)  His new supervisor at the NDU was SDDO Robert Rodriguez ("Rodriguez").  (Id. ¶ 17.)  On February 22, 2017, Plaintiff submitted, to Deputy Field Officer Director ("DFOD") Scott Mechkowski ("Mechkowski"), another request for a transfer to the Newburgh Office, or to "any assignment/other unit that would be closer to my residence which is in Orange County, NY." (Pl. 56.1 Counter-St. ¶ 18; docket entry no. 59-21.)  Plaintiff did not state that the request was related to his disability.  (Id.)  Around this time, Rodriguez began to note issues with Plaintiff's performance. In May 2017, Plaintiff received a negative performance review in which Rodriguez stated that Plaintiff "has been working at a slow pace" since reporting to the NDU.  (Id. ¶ 19.) Separately, Rodriguez informed Plaintiff's second-line supervisor, Assistant Field Office Director ("AFOD") Franz Jeudy ("Jeudy"), that Plaintiff "was always inattentive and distracted by his cell phone" and "display[ed] a total lack of interest in learning what was being taught to him."  (Id.)

In his declaration, Plaintiff states that he informed Rodriguez of his disability and explained that it was the reason for his slower work rate.  (Docket entry no. 72-1 ("Conklin Decl.") ¶ 10.)  Having so informed Rodriguez, Plaintiff "advised Mr. Rodriguez that [he] did not think it was fair especially since [Plaintiff] trusted and confided [his] pertinent medical

information with Mr. Rodriguez, as he was [Plaintiff's] supervisor.  Further, [Plaintiff] alluded to

the private discussion that previously took place between us about [Plaintiff's] disabling

conditions."  (Id. ¶ 11.)  Plaintiff then, at some point thereafter, "complained to Mr. Rodriguez's

supervisor, Wayne Muller, regarding Mr. Rodriguez's actions and Mr. Muller stated that he was

in 'retirement mode' and refused to deal with my complaints."  (Id. ¶ 12.)  At some point,

Plaintiff told Jeudy that Rodriguez had accused him of abusing ICE's Health Improvement

Program,[3] leading Jeudy to offer Plaintiff a reassignment, which Plaintiff accepted, to work

under SDDO Joseph Harrington ("Harrington").  (Defs. 56.1 St. ¶ 20.)

In his declaration, Plaintiff states that, at some point near the beginning of his

tenure with Harrington, he "requested to meet with Mr. Harrington privately and discuss the

particulars of [his] medical condition to ensure mutual understanding.  I explained to Mr.

Harrington that at times it took longer to complete tasks due to my disability."  (Conklin Decl. ¶

15.)  He further states that, shortly afterwards, "Harrington added over 10,000 cases to my

already 5,000 (sic) caseload" and that, "[u]pon information and belief," Harrington added those

cases to discriminate against Plaintiff because of his disability.  (Id. ¶¶ 16-17.)  Plaintiff states

that Harrington moved his assigned seat to "right outside [Harrington's] office," and ridiculed his

disability, allegedly "stating to [Plaintiff] that, this is where the 'handicapped officers sit'," and

"stating on numerous occasions that [Plaintiff] was disabled and slow."  (Id. ¶ 13.)  Plaintiff

asserts that Harrington would "continuously stare and stand over [him] throughout the day,"

would "routinely yell at" Plaintiff, (id. ¶ 21),  would "publicly announce to the workroom when

[Plaintiff] would go and return from the restroom" (id.) and would, "at times," "explode" at

Plaintiff, "seemingly enraged by [his] slower work speed comparted to others" (id. ¶ 18).  Once,

---

[3]        The record does not provide any information regarding the Health Improvement Program.

Plaintiff asserts, Harrington "threw a book during an outburst over [Plaintiff's] inability to perform at [Harrington's] standards." (Id. ¶ 19.)

At some point during the summer of 2017, Plaintiff "requested in person and via email that Mr. Jeudy stop the persistent harassment [from Harrington] [that Plaintiff] was receiving and re-assign [Plaintiff] so [he] would not have to work under Mr. Harrington any longer." (Conklin Decl. ¶ 20.)  Approximately six weeks into his period working under Harrington, Plaintiff "requested and was given" an assignment with a temporary work detail at the Law Enforcement Support Center ("LESC") in Vermont, where he remained from June 5, 2017, to July 19, 2017. (Defs. 56.1 St. ¶¶ 21-22; Conklin Decl. ¶ 24.)  At LESC, Plaintiff was told at least three times by his temporary supervisor that he had to improve his performance, which he subsequently did. (Conklin Dep. at 94:20-95:12.)

When Plaintiff returned from Vermont, the number of cases assigned to him had become significantly larger, and Plaintiff observed a stack of case files on his desk. (Defs. 56.1 St. ¶ 30.)  Although Plaintiff ascribes a malicious intent to this increase (Conklin Decl. ¶ 24), he admits that staffing issues caused the docket for each officer in his unit to increase in size. (See Pl. 56.1 Counter-St. ¶ 27 ("While Plaintiff was away on detail, there was only one officer under SDDO Harrington's supervision and, with Plaintiff gone, SDDO Harrington and that other deportation officer needed to handle the entire docket that was assigned to SDDO Harrington's unit—which led each officer's docket to increase in size . . . . Plaintiff's response: Admitted.").)  On July 25, 2017, Plaintiff sent an email to union officials that catalogued numerous grievances about SDDO Harrington:

> I started working for Harrington a few months back.  I applied to work at LESC detail from June 5th-July 19th to get away from him. His behavior is truly unpredictable.  My [f]irst day working for him he relocated my cubical to directly in front of his office saying that he was 'going to train

> me'.  Although I did not want to move, I agreed to in an attempt to please
> him and not make a first bad impression on an SDDO.  Since that day it
> has only gotten worse.  I personally witnessed him throwing things across
> his office in a rage, banging his fists on the desk and screaming in an
> unprofessional manner at the top of his lungs at me in front of many other
> Deportation Officers and ERA's including Monica Mcneil . . . This
> behavior is in actually (sic) frightening to a lot of DOs and ERAs who
> have worked for him previously.  It has created nothing but a hostile work
> environment and I no longer want to work for him or anywhere near him
> because of his unpredictable outbursts.

(Docket entry nos. 59-61 (the "Rosenbaum Decl.") Ex. 24 at 2.)  On August 1, 2017, Plaintiff

requested a meeting with Thomas Decker ("Decker"), Field Office Director of ICE's New York

City Office, "to discuss the active hostile work environment that was created by Mr. Harrington"

and, the next day, "reported the situation to all of the superiors in [his] chain of command and the

Office of Professional Responsibility," and went home sick.  (Conklin Decl. ¶¶ 25-26.)  Plaintiff

asserts that, "[i]mmediately after leaving work, [] Jeudy called [Plaintiff] and threatened that [he]

must report the next day to the Field Office Director's office for discipline regardless of whether

[he] was sick or not" and that Plaintiff "had no business reporting the incidents outside of his

chain of command."  (Id. ¶ 27.)

Included in Plaintiff's "report[ing] of the situation" was an email, submitted by

Plaintiff to ICE's Joint Intake Center ("JIC"), in which he alleged that Harrington was creating a

hostile work environment by "screaming profanities, banging his fist on his desk, and throwing a

book across the room in proximity of [Plaintiff]," and by "engag[ing] in rude, unprofessional, or

similarly inappropriate language . . . in proximity of [Plaintiff]."  (Rosenbaum Decl. Ex. 32 at 2.)

In response to Plaintiff's email, ICE's Office of Diversity and Civil Rights ("ODCR") conducted

an internal investigation, involving interviews of 24 witnesses.  (Defs. 56.1 St. ¶ 66.)  ODCR

found that Harrington had used "rude, unprofessional, or similarly inappropriate language or

conduct in proximity of" Plaintiff, and reprimanded him for the conduct.  (Rosenbaum Decl. Ex.

55.)  ODCR found the charge of a hostile work environment to be "unsubstantiated," but reached this conclusion not because Harrington's behavior fell short of the hostile work environment standard, but on the basis that "[n]either any of the witnesses nor [Plaintiff] made any claims that the alleged offensive acts were associated with [Plaintiff]'s membership in a protected class." (Rosenbaum Decl. Ex. 32)

On August 14, 2017, in response to Plaintiff's August 1 request for a meeting, Jeudy, Mechkowski, and union representatives met with Plaintiff to discuss his problems with Harrington, and Plaintiff submitted another request to be transferred to Newburgh.  (Defs. 56.1 St. ¶¶ 35-36.)  This request made no mention of Plaintiff's disability, but instead claimed "an imminent danger to [Plaintiff's] health and safety because of Harrington."  (Id.)

On August 14, 2017, following Plaintiff's meeting with Jeudy and Mechkowski, he was reassigned to a new unit, Order of Supervision, with a new supervisor, SDDO Christopher Smith ("Smith").  (Defs. 56.1 St. ¶ 37.)  Two days later, Plaintiff submitted his first formal reasonable accommodation request (the "Accommodation Request") to Smith.  (Id. ¶ 38.) In the Accommodation Request, Plaintiff disclosed a "disability documented prior to hire through Dallas Service Center, ICE" which he claimed had been "aggravated" by "harassment (sic) and hostility at work," and requested as an accommodation a transfer to the Newburgh Office.  (Id. ¶ 39; Conklin Decl. at 106:5-12.)  Upon receipt of the Accommodation Request, Smith forwarded it to Jeudy, who then forwarded it, on August 18, 2017, to ODCR, in line with internal policy.  (Id. ¶ 40.)  Plaintiff asserts that, in the Accommodation Request, he "specifically asked for a transfer away from Mr. Harrington and the hostile work environment that Mr. Harrington was creating for [him]," and that "Defendants never followed up with [Plaintiff] about this request until approximately one (1) year later."  (Conklin Decl. ¶¶ 32-33.)  However,

on the date Plaintiff submitted the Accommodation Request, Harrington was no longer Plaintiff's supervisor, as he had been re-assigned to a unit run by Smith.  (Pl. 56.1 Counter-St. ¶ 37.)

On September 5, 2017, Plaintiff was again transferred, this time to the Juvenile Unit, under the supervision of SDDO Linda Hyde ("Hyde").  (Id. ¶ 44.)  On September 15, 2017, and again on September 26, 2017, ODCR emailed Plaintiff to confirm this transfer satisfied his request for accommodation, but Plaintiff did not respond.  (Id. ¶ 41.)  Plaintiff states that he promptly informed Hyde about his medical condition "in or about the first week of September, (sic) 2017." (Conklin Decl. ¶ 38.)

Later in September 2017, Plaintiff was involved in a series of incidents with security officials and law enforcement, many details of which are disputed.  It is undisputed that, on Sept. 9, 2017, while off-duty, Plaintiff visited Stewart International Airport in New Windsor, New York.  (Defs. 56.1 St. ¶ 45.)  Defendants then allege, however, that, while at the airport, Plaintiff misidentified himself as a Homeland Security Investigations Officer, asked to be issued a Security Identification Display Area card (which would grant him access to sensitive operational areas of the airport), and told Basel Sabbagh, a Customs and Border Patrol official, that he should be notified of any law enforcement issues at the airport.  (Id.)  In support of their claims, Defendants proffer a September 20, 2017, email from Mr. Sabbagh, which corroborates Defendants' version of the visit.  (Rosenbaum Decl. Ex. 45 at 1.)  In his declaration, Plaintiff admits going to the airport, but asserts generally that all other allegations pertaining to the incident are "patently false."  (Conklin Decl. ¶ 80.)  At his deposition, Plaintiff admitted going to Stewart International Airport and speaking with Mr. Sabbagh but said that he only "introduced [him]self and asked [Mr. Sabbagh] where the SIDA office was to issue something."  (Conklin Dep. at 138:4-9.)  Asked whether he had told Mr. Sabbagh that he should be "notified of any law

enforcement issues at Stewart Airport, to include lookouts, cases or seizures," Plaintiff stated, "I don't know. I don't recall saying that." (Id. at 138:22-25.)

It is undisputed that Plaintiff called the Town of Woodbury Police Department on September 10, 2017, and reported a vehicle of potential interest to the Department of Homeland Security. (Defs. 56.1 St. ¶ 47.) Defendants allege that Plaintiff "requested that the Police Department not report the incident to his bosses," which Plaintiff denies in his response to Defendants' Local Rule 56.1 statement. (Pl. 56.1 Counter-St. ¶ 47.) At his deposition, however, when questioned on the incident, Plaintiff stated, "I remember keeping it, saying keep it in house, because sometimes when you report things, they, you know, overreact and the story gets twisted and stuff over the radio . . . so that's probably why I said keep it in house, but 'I don't want my bosses to find out about this,' that doesn't sound like me at all." (Conklin Dep. 144:17-25.)

Defendants also allege that a second incident took place later that same day, as follows:

> That evening, Plaintiff, while off-duty and driving a vehicle, stopped a girl who was walking alone on the side of the road and identified himself as a federal law enforcement officer. The girl's mother reported the incident to the City of Newburgh Police Department, and Plaintiff was subsequently pulled over by a City of Newburgh Police Department officer. Plaintiff refused to provide his credentials and driver's license to the officer and instructed his passenger not to identify himself to the officer. Plaintiff then drove off, despite being instructed not to, leading to a pursuit. Plaintiff was eventually pulled over and was brought to the City of Newburgh Police Department, where he refused to answer questions and pushed an officer in attempt to recover his cell phone.

(Defs. 56.1 St. ¶ 48 (internal record citations omitted).) In support of this version of events, Defendants provide a police report from the Town of Newburgh Police Department, including narrative statements from three Newburgh Police Officers who were present for the incident.

(Rosenbaum Decl. Ex. 57 at 21-31.)  In their narratives, the officers describe Plaintiff as

"belligerent," "uncooperative," "erratic," and "clearly intoxicated."  (Id.)  At one point, one

officer states that Plaintiff's "highly erratic behavior and rapid mood swings made him an

unpredictable threat consideration," leading the officers to "take [Plaintiff's] weapon for safe

keeping."  (Id. at 29.)  The police report relating this incident was submitted to ICE the next day.

(Id. at 22.)

Plaintiff provides a different version of events from that evening, stating in his

affidavit that "none of the accounts that I have read of that evening" provided by Defendants or

the Town of Newburgh Police Department "accurately reflect the facts or circumstances

surrounding that incident."  (Conklin Decl. ¶ 79.)  Plaintiff recounts that he and Mark Raymond,

a passenger in the car, "saw a scantily clad woman run across the road," "simply stopped the

vehicle and in a calm demeanor asker [her] if she needed assistance," and then waited for the

woman to be picked up.  (Conklin Decl. ¶ 75.)  Plaintiff claims that he then attempted to call the

police and report the incident, and that "the dispatcher instructed me to drive to the police station

and speak with Sergeant Carpenter."  (Id.)  Plaintiff asserts that he was stopped by a police

officer on the way to the station and instructed to follow him, but that same officer then pulled

him over "and advised us that we had 'driven off,'" even though Plaintiff was "simply following

the officer's instruction[] to go to the police department."  (Id. ¶ 76.)  Plaintiff asserts that the

officer "became agitated" and detained Plaintiff "without, in [Plaintiff's] opinion, any cause or

reason whatsoever."  (Id. ¶ 77.)  Plaintiff further claims that his vehicle was confiscated "without

any cause or reason whatsoever," that the officers made derogatory remarks about him, and that

he and Raymond were "forced to take taxis home."  (Id. ¶ 78.)

Defendants allege an additional incident, on September 14, 2017, in which the Allendale, New Jersey Police Department "received a report of harassment and domestic violence from a woman claiming to be Plaintiff's ex-girlfriend." (Defs. 56.1 St. ¶ 50.) Plaintiff denies, without citing evidence, that such a report was received. (Conklin Decl. ¶ 81.) In support, Defendants proffer an email, sent September 15, 2017, from a Section Chief of ICE's Joint Intake Center ("JIC"), stating that "Sgt. Lawler [of the Allendale Police Department] advised on 9/14/2017, APD received a complaint of harassment and domestic violence (APD incident report #17-12994) from a female who stated that she was [Plaintiff's] ex-girlfriend." (Rosenbaum Decl. Ex. 50 at 2.) Further, Plaintiff admits Defendants' contention that "that report [to the Allendale Police Department] was prompted by two incidents that had occurred earlier that day: (i) the woman received a series of text messages from Plaintiff that 'made her feel very uncomfortable,' and (ii) Plaintiff, in an effort to reach the woman, had contacted the woman's mother under false pretenses, using an alias."[4] (Defs. 56.1 St. ¶ 51.)

On September 15, 2017, Plaintiff was hospitalized in the Behavioral Health Unit at Orange Regional Medical Center, where he remained until October 5, 2017. (Id. ¶ 53.) As a result of these incidents, the Department of Homeland Security's Office of the Inspector General (DHS OIG) commenced an internal investigation. (Defs. 56.1 St. ¶ 56.) Pending the results of the investigation, ICE suspended Plaintiff's security clearance, badge and firearm access, and security credentials, and placed him on administrative/limited duty.[5] (Id. ¶ 49.) In an email

---

[4]     Plaintiff admits this assertion, but denies it to the extent that he claims that he wanted to return the woman's property, rather than "reach" her. (Pl. 56.1 Counter-St. ¶ 51.)

[5]     These terms are used interchangeably by both parties throughout the record.

from his union, Plaintiff was informed that these suspensions meant that he "could not perform the duties of a deportation officer."  (Defs. 56.1 St. ¶ 58.)

In December 2017, Plaintiff returned to work under a new supervisor, SDDO Joanna Delgado ("Delgado"), and was placed at the reception desk at 201 Varick Street.  (Defs. 56.1 St. ¶ 59.)  Defendants assert that Plaintiff was placed at the reception desk because he was limited to administrative duties while the internal investigation into his conduct was pending. (Pl. 56.1 Counter-St. ¶ 59.)  Plaintiff, however, claims that, "[u]pon information and belief, [Plaintiff's reassignment to the reception desk] was done to further discriminate against [him] based on [his] documented mental disabilities . . . ."  (Conklin Decl. ¶ 50.)  Plaintiff also asserts that he was required to inform his supervisors each time he wanted to use the bathroom.  (Id. ¶ 49.)  Plaintiff asserts, in June 2018, that he informed another supervisor, Robert Sperrugia, about his disability and "how the front desk assignment was extremely demeaning and constituted a continuous act of discrimination towards [him]."  (Id. ¶ 52.)  Plaintiff states that "[a] senior deportation officer added that the placement was being used to circulate a statement to other employees that if you speak out against management; this is what will happen to you." (Id. ¶ 53.)  At some point, Plaintiff "became emotionally distraught over this further discriminatory act by Defendants and . . . requested a change in [his] seating assignment," but Delgado "dismissed [Plaintiff's] multiple complaints and told [Plaintiff] that this assignment came from upper management and was final until further notice."  (Id. ¶ 51.)  At some point, Plaintiff complained to "James Rothermel, another supervisor," about the restrictions on his bathroom usage, because Plaintiff "was taking medication for my medical condition that caused [Plaintiff] to have to use the restroom quite often."  (Id. ¶ 54)  Plaintiff asserts that Rothermel

told Plaintiff that he could no longer use the restroom without Rothermel's permission and that he "did not give a 'flying Fuck about the medication you're taking.'"  (Id.)

On October 1, 2018, Plaintiff reported to Delgado that someone was leaving a copy of a newspaper, "Gay City News," on the front desk at 201 Varick Street, where Plaintiff had been assigned to work.  (Pl. 56.1 Counter-St. ¶ 63.)  He also told Delgado that, if he left his computer unattended, his "computer screen saver would be changed to inappropriate images." (Conklin Decl. ¶ 55.)  Plaintiff, who identifies as heterosexual, believed the newspaper was left at his desk "with the intent to harass him, and possibly in retaliation for his filing an ODCR complaint in December 2017.  (Pl. 56.1 Counter-St. ¶ 64.)  Delgado reported the incident to JIC (Rosenbaum Decl. Ex. 29 at 1) which, in its investigation, interviewed another deportation officer who admitted the newspaper was his and said that he had left it there inadvertently.  (Pl. 56.1 St. ¶ 65.)

Plaintiff asserts that, "[b]etween January 2018 and December[] 2018, [he] applied for transfers two (2) times to a smaller office, specifically the Newburgh Office," but that these transfers were denied and "given to someone with less seniority."  (Conklin Decl. ¶ 57.)  It is undisputed that, in June 21, 2018, Plaintiff received a response from his union following an inquiry into why he had been skipped on the transfer list, and was told that, because he had been stripped of his security clearance, weapon, and badge, he did not qualify for a transfer.  (Defs. 56.1 St. ¶ 58.)  There is no evidence that Plaintiff made any additional requests for accommodation after 2018.

On December 18, 2017, Plaintiff commenced a pre-complaint process with ODCR, alleging discrimination by Harrington and Jeudy in the form of a poor performance evaluation, issued in November 2017, for the period between October 1, 2016, and September

30, 2017.  (Rosenbaum Decl. Ex. 63 ("EEOC Counselor's Report").)  On April 5, 2018, Plaintiff

filed a formal complaint with ODCR, which he amended on June 15, 2018, August 3, 2018,

November 7, 2018, and November 23, 2018.  (Defs. 56.1 St. ¶¶ 61-62.)  In that complaint,

Plaintiff stated: "I am a male with a disability residing in the State of New York.  I have been

diagnosed mood disorder (sic) and anxiousness.  My disabilities can impair my life functions."

(EEOC Counselor's Report at 10.)  ODCR conducted an extensive investigation of Plaintiff's

allegations, involving interviews with 22 witnesses.  (Id. ¶ 66.)  ODCR then referred the matter

to the Equal Employment Opportunity Commission ("EEOC"), but the matter was dismissed

when Plaintiff opted to litigate his claims.  (Id. ¶ 67.)

In June 2019, the Department of Homeland Security's Office of the Inspector

General ("OIG") issued a report of its internal investigation into Plaintiff's conduct in September

2017, finding that Plaintiff "was unprofessional in his interactions with the Town of Newburgh,

NY Police Department (TNPD), other law enforcement, and individuals with whom he had a

prior relationship."  (Defs. 56.1 St. ¶ 68.)  On this basis, the OIG charged Plaintiff with

exhibiting a "lack of candor" and "conduct unbecoming of a law enforcement officer," and, on

December 9, 2019, served him with a proposal to remove him from federal service and an

administrative leave notice.[6]  (Id. ¶ 69; Rosenbaum Decl. Ex. 44 ("Proposal to Remove").)  The

Proposal to Remove stated that, inter alia, Plaintiff had "not conducted [him]self in accordance

with the law, regulations, Agency rules, and the high standards of conduct expected of ICE

employees and [law enforcement officers]" and that his conduct "directly conflict[ed] with the

---

[6]     Plaintiff asserts that the proposal to remove was based not on the findings of the OIG's
        investigation, but "was proposed to further retaliate against Plaintiff".  (Pl. 56.1 Counter-
        St. ¶ 69; Conklin Decl. ¶ 63 ("Upon information and belief, this proposal to terminate
        was issued in direct retaliation for my filing an EEOC complaint against Franz Jeudy and
        other managerial staff.").)

professionalism and reliability required of [his] position." (Proposal to Remove at 7.) Pending adjudication of the removal proposal, Plaintiff was placed on paid, non-duty status. (Defs. 56.1 St. ¶ 72.)

In a letter submitted to Decker on January 28, 2020, Plaintiff's attorney disclosed that Plaintiff suffers from bipolar disorder, and stated that "[Plaintiff] has regretfully determined that it is highly unlikely that he could, within a reasonable period of time[,] return to work in his Deportation Officer position." (Defs. 56.1 St. ¶ 73; Rosenbaum Decl. Ex. 72.) Two days later, as part of Plaintiff's oral reply to the Proposal to Remove, his attorney stated that Plaintiff was "not fit for duty at this point, and his mental health condition is completely [and] utterly incompatible with the duties of a law enforcement officer." (Id. ¶ 74.) At the time of his reply, Plaintiff had already successfully applied for worker's compensation (id.), as well as disability retirement, which was approved on June 26, 2020 (id. ¶ 76). In March 2020, Decker removed Plaintiff from his position, finding by a preponderance of the evidence that Plaintiff's conduct exhibited a lack of candor and conduct unbecoming of a law enforcement officer. (Id. ¶ 77.) On either March 26 or March 27, 2020, Plaintiff's employment was terminated. (Id. ¶ 78; Pl. 56.1 Counter-St. ¶ 78.) Plaintiff receives disability retirement payments of "around $1,500 a month." (Id.)

<u>DISCUSSION</u>

Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is considered material if it "might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Caladora v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (citation omitted). The nonmoving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004) (citation omitted).

Defendants' Request for Preclusion

        Plaintiff's response to the Motion for Summary Judgment includes one sworn declaration from Plaintiff and four such declarations from other individuals: Steven Middleton, a non-party to the case and former co-worker at ICE (docket entry no. 68 ("Middleton Decl.")); Reno Mayoral ("Mayoral"), a non-party to the case and former co-worker at ICE (docket entry no. 69 ("Mayoral Decl.")); Mark Raymond ("Raymond"), a non-party to the case who was Plaintiff's passenger during his encounter with the Town of Newburgh Police Department (docket entry no. 70 ("Raymond Decl.")); and Michael Taback ("Taback"), a non-party to the case and detective "working in a police jurisdiction within Orange County, New York" (docket entry no. 71 ("Taback Decl.")) (collectively, with the Raymond Decl. and Mayoral Decl., the "Disputed Declarations").  Defendants have moved to preclude Plaintiff from using the Disputed Declarations on the grounds that Mayoral, Raymond, and Taback were not listed as potential witnesses in Plaintiff's initial disclosures under Federal Rule of Civil Procedure 26(a).  (Docket entry no. 76 ("Reply") at 3-4.)

        "Before discovery, parties have a duty to make initial disclosures under Rule 26, which includes disclosing the identities of persons 'likely to have discoverable information . . .

that the disclosing party may use to support its claims or defenses.'" <u>Capitol Records, LLC v.</u>

<u>Escape Media Group, Inc.</u>, No. 12-CV-06646-AJN-SN, 2014 WL 12698683, at *4 (S.D.N.Y.

May 28, 2014), <u>report and recommendation adopted</u>, 2015 WL 1402049 (S.D.N.Y. Mar. 25,

2015) (quoting Fed. R. Civ. P. 26(a)(1)(A)(i)).  If a moving party fails to make these disclosures

as required, a district court has discretion to prohibit the party from using "that information or

witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was

substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  Rule 37(c)(1) is designed to

"prevent the practice of 'sandbagging' an opposing party with new evidence." <u>Haas v. Delaware</u>

<u>& Hudgson Ry. Co.</u>, 282 Fed. Appx. 84, 86 (2d Cir. 2008) (citation omitted).  "Exclusion of

evidence under Rule 37(c)(1) does not require a showing of bad faith." <u>Capitol Records</u>, 2014

WL 12698683, at *4 (citing <u>Design Strategy, Inc. v. Davis</u>, 469 F.3d 284, 296 (2d Cir. 2006)).

 The Second Circuit has explained that a court's use of its authority under Rule 37

to preclude evidence is discretionary, rather than automatic.  <u>See</u> <u>Design Strategy</u>, 469 F. 3d. at

298.  In exercising this discretion, courts consider the following factors:

> (1) The party's explanation for the failure to comply with the [disclosure
> requirement]; (2) the importance of the testimony of the precluded
> witness[es]; (3) the prejudice suffered by the opposing party as a result of
> having to prepare to meet the new testimony; and (4) the possibility of a
> continuance.

<u>Patterson v. Balsamico</u>, 440 F. 3d 104, 117 (2d Cir. 2006) (quotation omitted).

 With respect to the first factor, Plaintiff has proffered no explanation in his

opposition for his failure to include Mayoral, Raymond, and Taback in his initial disclosures, or

for his failure to promptly modify those disclosures upon determining that he would proffer

evidence through previously undisclosed witnesses, as required under Rule 26(e).  <u>See</u> Fed. R.

Civ. P. 26(e) ("A party who has made a disclosure under Rule 26(a) . . . must supplement or

correct its disclosure . . . in a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect . . ..").  Nor has Plaintiff requested leave to file a sur-reply to respond to Defendants' argument that these statements should be excluded on this basis, despite Defendants' objection having been submitted nearly eleven months ago.  See Gunawan v. Sake Sushi Restaurant, No. 09-CV-5018-ALC, 2011 WL 3841420, at *4 n.1 (E.D.N.Y. Aug. 26, 2011) ("Defendant's opposition brief did not address this issue [its failure to disclose a fact witness in its initial disclosures] . . . nor did Defendant seek leave to file a sur-reply in the face of Plaintiff's objection to the consideration of the Declarations.  Because Federal Rule of Civil Procedure 37(c)(1) prohibits the use of undisclosed evidence in the absence of 'substantial justification,' those Declarations were not considered.").  The first factor thus weighs in favor of Defendants.  The second factor also weighs in favor of Defendants, as Plaintiff did not cite any of the Disputed Declarations in his opposition.  Cf. Capitol Records, 2014 WL 12698683 at *10 (finding a declaration to be "particularly important" because it was cited frequently in opposition papers of the party that introduced the evidence).  Third, Defendants would be substantially prejudiced if the Court were to consider the Disputed Declarations because Defendants did not have the opportunity to depose Mayoral, Raymond, or Tabak or to address the Disputed Declarations in their initial memorandum of law.  See Hass v. Delaware and Hudson Ry. Co., 282 Fed. Appx. 84, 86 (2d Cir. 2008) (noting that a nonmoving party's stated basis for failing to disclose a witness "[did] not diminish the prejudice cause by waiting until after the close of discovery and, moreover, after [the moving party] had prepared and filed its motion for summary judgment").  Finally, granting a continuance at this late stage would be inefficient, prejudicial to Defendants, and would essentially reward Plaintiff for his violations of Rule 26.  Discovery has

been closed in this matter since September 2021.  (Docket entry no. 42.)  A continuance, which has not been requested by either party, is not warranted by the circumstances of this case.

Because all of the <u>Patterson</u> factors to weigh in favor of the Defendants, and in light of Plaintiff's violations of Rule 26, the Court grants Defendant's preclusion application and will not consider the Mayoral Declaration, Raymond Declaration, and Taback Declaration in resolving the summary judgment motion practice.

<u>Intentional Discrimination (Disparate Treatment)</u>

Plaintiff claims that he was repeatedly discriminated against because of his disability, which he characterizes in the AC as a "mood disorder connected with bipolar disorder and anxiousness" (AC ¶ 6), in violation of the Rehabilitation Act.  "Disability discrimination claims under the Rehabilitation Act . . . are analyzed under the same standard used for ADA discrimination claims."  <u>Piligian v. Icahn School of Medicine at Mount Sinai</u>, 490 F. Supp. 3d 707, 716 (S.D.N.Y. 2020).  Claims of disparate treatment brought pursuant to the Rehabilitation Act are assessed under the three-part burden-shifting analysis outlined in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).  <u>See</u>, <u>e.g.</u>, <u>Voss v. McDonough</u>, No. 17-CV-09015-PMH, 2021 WL 4199941, at *9 (S.D.N.Y. Sept. 15, 2021) (citation omitted).

Under this analysis, the plaintiff must first proffer evidence establishing a prima facie case of discrimination.  To do so under the RA, a plaintiff must demonstrate that "(i) [his] employer is subject to the RA, (ii) Plaintiff is a disabled person as defined by the RA, (iii) Plaintiff is 'otherwise qualified' for the position (meaning that [he] could perform the essential functions of [his] job with or without reasonable accommodation), and (iv) Plaintiff suffered an adverse employment action because of [his] disability."  <u>Edwards v. Wilkie</u>, No. 16-CV-8031-LTS-OTW, 2020 WL 2792997, at *9 (S.D.N.Y. May 29, 2020) (citation omitted).  "A plaintiff

may raise an inference of discrimination for the purposes of making out a prima facie case by . . .

showing that [his] employer treated [him] less favorably than a similarly situated employee

outside [his] protected group."  Risco v. McHugh, 868 F. Supp. 2d 75, 100 (S.D.N.Y. 2012)

(citing Mandell v. Cnty. Of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003)).  "Disparate treatment

between 'similarly situated employees' gives rise to a presumption of discriminatory intent."

Edwards, 2020 WL 2792997, at *9 (internal quotation marks omitted).  For the purpose of this

order, the Court assumes that ICE is subject to the RA, and that Plaintiff is a disabled person as

defined by the RA.

       The second step shifts the burden to the employer to offer some legitimate, non-

discriminatory reason for its actions.  If a prima facie case is established, "a presumption arises

that more likely than not the adverse conduct was based on the consideration of impermissible

factors and the burden then shifts to the employer to articulate some legitimate,

nondiscriminatory reason for the disparate treatment."  Voss, 2021 WL 4199941, at *9 (citation

omitted).  The employer does not need to prove by a preponderance of evidence that the

challenged action was not the product of discrimination, "but may simply 'present clear and

specific reasons for the action.'"  Gibbs v. Consolidated Edison Co. of New York, Inc., 714 F.

Supp. 85, 89 (S.D.N.Y. 1989) (quoting Neale v. Dillon, 534 F. Supp. 1381, 1387 (E.D.N.Y.

1982), aff'd, 714 F.2d 116 (2d Cir. 1982)).  "The presumption of discrimination arising from the

prima facie case drops out upon such a proffer of a legitimate, non-discriminatory reason."

Edwards, 2020 WL 2792997, at *9.

       If the employer meets this burden by proffering a legitimate, non-discriminatory

reason for the action, "the plaintiff must demonstrate that the reasons offered by the defendant

are a mere pretext for discrimination."  Alvarado v. United Hospice, Inc., No. 20-CV-10790-

KMK, 2022 WL 4485379, at *12 (S.D.N.Y. Sept. 27, 2022) (quotation omitted); see also

Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 251 (2d Cir. 2014) ("[T]he final and ultimate

burden is on the plaintiff to establish that the Defendants' reason is in fact pretext for unlawful

discrimination.") (citation omitted).

      As an initial matter, Defendants argue that Plaintiff has not suffered any adverse

employment action, as is required to make out a prima facie case of discrimination under

McDonnell Douglas.  (Docket entry no. 57 ("Defs. Mem.") at 20-22.)  An adverse employment

action is:

> more disruptive than a mere inconvenience of job responsibilities.  It is a
> materially significant disadvantage with respect to the terms of [the
> plaintiff's] employment.  Examples of materially significant disadvantages
> include termination, demotion, "a less distinguished title, a material loss of
> benefits, [or] significantly diminished material responsibilities."

Littlejohn v. City of New York, 795 F.3d 297, 312 n.10 (2d Cir. 2015) (citations and alterations

omitted).  "Actions that are 'trivial harms' – i.e., 'those petty slights or minor annoyances that

often take place at work and that all employees experience' – are not materially adverse."

Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 (2d Cir. 2011) (quoting

Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

      Plaintiff, without evidentiary citation or specific factual allegations, asserts in his

memorandum of law that he suffered the following adverse employment actions:

> Here, supervisors repeatedly mistreated Plaintiff in ways routinely found
> to constitute adverse employment actions.  This included, inter alia,
> termination; degrading and damaging workloads and protocols that caused
> a detrimental toll on Plaintiff's health; repeated failure to reasonably
> accommodate Plaintiff's disability; negative performance evaluations;
> reprimands; discriminatorily frivolous and biased investigations[;]
> increased scrutiny; verbal abuse[;] and even physical abuse by having a
> physical object thrown at Plaintiff and denying Plaintiff a basic human
> right of using the bathroom.

(Pl. Mem. at 3) (internal case citations omitted).  The Court has considered each of these assertions in light of the record.

"Degrading and Damaging Workloads and Protocols"

First, Plaintiff argues that he suffered an adverse employment action due to "degrading and damaging workloads and protocols that cause a detrimental toll on Plaintiff's health."  Although Plaintiff does not plead with specificity the nature of his "degrading and damaging workloads and protocols," the Court construes this argument as referencing (1) the increase in the size of Plaintiff's docket under Harrington (see Conklin Decl. ¶¶ 16-17 ("Shortly after [informing Harrington of Plaintiff's disability], Mr. Harrington added over 10,000 new cases to my already 5,000 caseload [sic.]. . . . Upon information and belief, Mr. Harrington added these cases to my responsibilities as a way to discriminate and harass me because of my disability.")); (2) Plaintiff's reassignment to limited duty and placement at the reception desk at 201 Varick Street; and (3) Defendants' alleged imposition of a requirement that Plaintiff request permission to use the bathroom.

A disproportionately heavy workload can constitute an adverse employment action.  See Feingold v. New York, 366 F. 3d 138, 152-53 (2d Cir. 2004) (explaining that allegations of "the assignment of a disproportionately heavy workload" "if true, would show that [plaintiff] experienced [an] adverse employment action[]").  However, even viewing this evidence in the light most favorable to Plaintiff, the Court finds that no reasonable jury could find an adverse employment action as to Plaintiff's workload, because he has failed to provide any non-conclusory evidence that his workload was *disproportionate*.  Plaintiff concedes that, due to a decrease in the number of officers under Harrington's supervision, each officer's docket increased in size, implying that, while Plaintiff's workload may have grown heavier, the increase

was not disproportionate or singular to him.  Plaintiff also concedes that he does not know the

size of the dockets of other deportation officers, and that he assumed he had a larger workload

because Harrington would stack files on his desk:

> [Plaintiff] assumed that the stacking indicated that he had a larger docket
> than other deportation officers – though Plaintiff has acknowledged that he
> was not aware of the size of the other deportation officers' dockets, the
> rate at which other deportation officers moved through their dockets, or if
> SDDO Harrington had stacked files on other deportation officers' desks
>
> …
>
> Plaintiff's Response: Admitted.

(Pl. 56.1 Counter-St. ¶ 30.)  That files were stacked on Plaintiff's desk is therefore not probative

of the relative size of Plaintiff's workload.  Plaintiff's only other proffer in support of this claim,

that "he had a heavier workload than other people in the group," (id.), without more, is

insufficient to create a genuine issue of material fact as to whether his workload was

disproportionately heavy, such that it constituted an adverse employment action.[7]

      Plaintiff's reassignment to limited duty and placement at the reception desk at 201

Varick Street could be found, by a reasonable jury, to constitute an adverse employment action.

"Examples of materially adverse employment actions include . . . significantly diminished

material responsibilities."  Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004) (citation

---

[7]    Even if Plaintiff had pled an adverse employment action as to the size of his workload, he
makes no non-conclusory argument as to why Defendants' stated non-discriminatory
reason for the increase in his workload—a decrease in the number of Deportation
Officers in his group—is a mere pretext for discrimination.  (See Def. Mem. at 24.)  His
claim that, "upon information and belief," his workload was increased because of his
disability, is conclusory and insufficient to defeat summary judgment.  See Selvaggi v.
Grand Union Co., Inc., No. 96-CV-2077-DC, 1997 WL 786943, at *1 (S.D.N.Y. Dec. 22,
1997) (explaining that, at summary judgment, "[m]ere conclusory allegations or denials
will not avail the nonmoving party" (citation omitted)).

omitted).  The record makes clear that being placed on limited duty significantly diminished Plaintiff's material responsibilities.  For example, in a sworn statement provided by Assistant Field Office Director Jacob Antoninis ("Antoninis") as part of ICE's inquiry into Plaintiff's allegations against Harrington, Antoninis stated that "[s]ince Plaintiff is on limited duty, he only works the reception desk and answers phones and received stay filings and other documents/correspondence submitted by family members or attorneys of detained aliens.  He does not do regular [Deportation Officer] work."  (Rosenbaum Decl. Ex. 32 at 63.)  In addition to being placed on limited duty, Plaintiff was stripped of his security clearance, firearm, qualification scores, and badge, which, according to Plaintiff's union, meant he could not perform the duties of a Deportation Officer.  Viewing this record in the light most favorable to Plaintiff, a reasonable jury could find that these decisions by Plaintiff's employer constitute an adverse employment action.

However, this adverse employment action cannot support a claim for discrimination because Defendants articulate a legitimate, non-discriminatory basis for Plaintiff's treatment, which Plaintiff fails to rebut as pretextual.  Although Plaintiff disputes the underlying facts of the various incidents from September 2017, it is undisputed that Defendants received numerous reports, from a number of different law enforcement agencies, raising legitimate concerns about Plaintiff's fitness to perform his duties as a Deportation Officer, carry a weapon, and enjoy access to sensitive information.  While Plaintiff disputes the veracity of those allegations, that Defendants had received such a volume of allegations of dangerous and unbecoming conduct leads the Court to conclude, even viewing the evidence in the light most favorable to the Plaintiff, that no reasonable jury could find Defendants' decision to place Plaintiff on limited duty was merely a pretext for discrimination.  Plaintiff's conclusory

assertions that "Defendants cannot even offer a legitimate reason for much of their adverse action" and that Defendants' stated grounds for their actions are "mere pretext" (Pl. Mem. at 9) are, without more, insufficient to defeat summary judgment.

Plaintiff's claim that he had to inform his supervisors when he would use the bathroom and wait for a relief clerk to fill in for him (Conklin Decl. ¶ 49), while undeniably inconvenient and displeasing, does not rise to the level of a materially adverse change in Plaintiff's employment because the requirements did not affect Plaintiff's position, compensation, or ability to do his job.  See Nakis v. Potter, No. 01-CV-10047, 2004 WL 2903718, at *20 (S.D.N.Y. Dec. 15, 2004) (finding that failure to provide keys to employee bathroom, despite employee's requests, was not an adverse employment action).

Negative Performance Reviews and Reprimands

Plaintiff also argues that he suffered an adverse employment action in the form of negative performance evaluations and reprimands from his supervisors.  However, "[n]egative performance evaluations qualify as adverse employment actions only if they are accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss."  Smith v. City of New York, 385 F. Supp. 3d 323, 334 (S.D.N.Y. 2019) (citation omitted).  "Negative evaluations, standing alone without any accompanying adverse results, are not cognizable under the anti-discrimination laws." Id. (cleaned up and quotation omitted) (collecting cases).  The same analysis applies to reprimands – they do not constitute adverse employment actions absent accompanying negative consequences.  See Farina v. Branford Bd. Of Educ., 458 F. App'x 13, 17 (2d Cir. 2011) (holding that "[w]hile negative employment evaluation letters[] or reprimands may be considered adverse employment actions," to be so considered they must have "had an effect on the terms on conditions of . . . employment") (internal quotation marks and citation

omitted).  Here, while Plaintiff has presented evidence of changes to the terms and conditions of his employment during his time at ICE (i.e., the diminution of his responsibilities, reassignment to front desk duty, and eventual termination), the record provides no evidence, even when viewed in the light most favorable to Plaintiff, that his negative evaluations or reprimands were related to, let alone the cause of, those changes.  No reasonable jury, therefore, could find that Plaintiff's negative performance evaluations and reprimands constitute adverse employment actions for purposes of establishing a discrimination claim.

> <u>Internal Investigation and Termination</u>

Termination is an adverse employment action because it constitutes a material change in the conditions of employment.  <u>See</u> <u>Feingold</u>, 366 F.3d at 152 ("Examples of materially adverse employment actions include termination of employment . . . .") (internal quotation marks and citation omitted).  While internal investigations, without more, are generally insufficient to constitute an adverse employment action, <u>see, e.g.</u>, <u>Jaeger v. North Babylon Union Free School District</u>, 191 F. Supp. 3d 215, 228 (E.D.N.Y. 2016) ("[T]he law is clear that investigations alone are not adverse employment actions") (citation and internal alterations omitted) (collecting cases), an investigation may be considered an adverse employment action when it results in punishment that objectively alters for the worse the terms and conditions of a plaintiff's employment.  <u>See</u> <u>Bain v. Wrend</u>, No. 5:15-CV-202-GWC, 2020 WL 1316660, at *8 (D. Vt. Mar. 20, 2020) ("It is clear that an investigation which does not result in workplace discipline does not qualify as an adverse employment action.  But the converse is also true.") Here, Defendants' decision to terminate Plaintiff's employment resulted directly from Defendants' investigation into Plaintiff's alleged misconduct.  (<u>See</u> Rosenbaum Decl. at Ex. 78

("Removal Letter").)  The internal investigation therefore constitutes an adverse employment action.

Even if a reasonable jury could find Plaintiff to have made out a prima facie case of discrimination as to Defendants' internal investigation and subsequent termination, however, the Court finds that Defendants have proffered legitimate nondiscriminatory reasons for their actions, which Plaintiff fails to rebut.  Defendants' receipt, from numerous sources, of concerning information regarding Plaintiff's behavior in September 2017, the recommendation of investigators that Plaintiff be removed, and the ultimate admission by Plaintiff's attorney that Plaintiff could not perform the responsibilities of his job, provide uncontroverted non-pretextual bases for the initiation of an investigation into Plaintiff's behavior and for his subsequent removal.  Plaintiff has failed to raise a genuine issue of fact as to whether any of these reasons was pretext for anti-disability animus.

### Verbal and Physical Abuse and Increased Scrutiny

Plaintiff does not plead with specificity what comments he places under the term "verbal abuse" but, in any case, "verbal abuse is typically insufficient to constitute an adverse employment action because negative or otherwise insulting statements are hardly even actions, let alone adverse actions."  Scott v. City of New York Dept. of Correction, 641 F. Supp. 2d 211, 231 (S.D.N.Y. 2019) (internal quotation marks and alterations omitted) (collecting cases); see also Matias v. Montefiore Medical Center, No. 20-CV-2849-VEC, 2022 WL 4448585, at *5 n.16 (S.D.N.Y. Sept. 23, 2022) (explaining that "verbal abuse" does not constitute an adverse employment action because it does not amount to a materially adverse change in the terms and conditions of employment).  Similarly, Plaintiff's allegation that Harrington "threw a book during an outburst over my inability to perform at [his] standards" does not constitute an adverse

employment action.  See Sullivan v. NYC Department of Investigation, 163 F. Supp. 3d 89, 98

(S.D.N.Y. 2016) (finding no adverse employment action where a supervisor "threw work back at

plaintiff and told plaintiff she wrote like a six year old"); Mathirampuzha v. Potter, 548 F.3d 70,

73 (2d Cir. 2008) (finding no adverse employment action where a supervisor "grabbed the

plaintiff's arm, punched him in the shoulder and the chest, spit in his face, and poked him in the

eye" because such treatment did not impact plaintiff's position, pay, or ability to do his job).

Increased scrutiny, the nature of which Plaintiff does not explain with specificity, also does not

constitute an adverse employment action.  See Smith v. New York and Presbyterian Hospital,

440 F. Supp. 3d 303, 334 (S.D.N.Y. 2020) ("[A]lleged close monitoring or observation by an

employer is not an adverse action."); Moses v. City of New York, No. 06-CV-5974-JSR, 2007

WL 2600859, at *2 (S.D.N.Y. Aug. 28, 2007) ("[I]ncreased scrutiny does not constitute adverse

action.") (citation omitted).

       For the foregoing reasons, the Court finds that no reasonable jury could determine

that Plaintiff has established a claim for intentional discrimination, even viewing the evidence in

the light most favorable to him.  Defendants' Motion for Summary Judgment as to Plaintiff's

claim for intentional discrimination is granted.

Failure to Accommodate[8]

       To make out a prima facie case for failure to accommodate under the

Rehabilitation Act, an employee must allege that "(1) [he] is a person with a disability under the

---

[8]    Plaintiff claims that Defendants' alleged failure to accommodate his disability also
constitutes an adverse employment action for the purpose of establishing a discrimination
claim under the Rehabilitation Act.  However, as no reasonable jury could find that
Defendants have failed to provide reasonable accommodation, Plaintiff cannot assert a
discrimination claim on that basis.

meaning of the RA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, [he] could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."[9] <u>Noll v. Int'l Business Machines Corp.</u>, 787 F.3d 89, 94 (2d Cir. 2015) (quotation omitted). "Once a plaintiff has established a prima facie case, the burden then shifts to the defendant to show '(1) that making a reasonable accommodation would cause it hardship, and (2) that the hardship would be undue.'" <u>Bonds v. County of Westchester</u>, No. 19-CV-1712-KMK, 2020 WL 4347704, at *11 (S.D.N.Y. Jul. 28, 2020) (quoting <u>Mitchell v. Washington Cent. Sch. Dist.</u>, 190 F.3d 1, 6 (2d Cir. 1999)). The Plaintiff must also "plead sufficient facts to raise the inference that the failure was motivated by discriminatory intent." <u>Id.</u> (citations omitted). Generally, a plaintiff must show "the *connections* between (1) the failure to accommodate the disability, (2) the performance deficiencies, and (3) the adverse employment action." <u>Parker v. Sony Pictures Entm't, Inc.</u>, 260 F.3d 100, 108 (2d Cir. 2001) (emphasis in original) (internal quotation marks and citation omitted).

   As an initial matter, the Court notes that Plaintiff failed to respond to Defendants' arguments that he has not established a prima facie case for failure to accommodate, instead arguing in a conclusory manner, without evidentiary citation, that Plaintiff suffered discriminatory treatment by "repeated denial and ignoring of Plaintiff's reasonable accommodation requests." (Pl. Mem. at 11.) Generally, an argument not addressed in an opposition to a summary judgment motion is considered waived. <u>See, e.g.</u>, <u>In re UBS AG Securities Litigation</u>, No. 07-CV-11225-RJS, 2012 WL 4471265, at *18 n.18 (S.D.N.Y. Sept. 28,

---

[9]    Although <u>Noll</u> considered claims for failure to accommodate brought under the Americans with Disabilities Act of 1990 (the "ADA"), claims brought under the RA are considered under the same standard. <u>See, e.g.</u>, <u>Lyons v. Legal Aid Soc.</u>, 68 F.3d 1512, 1515 (2d Cir. 1995).

2012) (finding that plaintiff, by failing in its opposition brief to address certain arguments by defendants, has "conceded the point by silence").  Even if Plaintiff had addressed the Defendants' arguments, however, no reasonable jury could find that Defendants failed to reasonably accommodate Plaintiff's disability.  Although Plaintiff fails to specify the requests to which he refers in his brief, the Court has reviewed all requests from Plaintiff evidenced by the record.

### April 14 Shift Change Request

First, Plaintiff requested a shift change on April 14, 2016, as he had been working overnight shifts.  (Pl. 56.1 Counter-St. ¶ 11.)  This request was granted, and Plaintiff was moved to a daytime shift under SDDO Gabriel Hoke.  (Id.)  As this request was granted, it cannot form the basis for a claim for failure to accommodate.

### Newburgh Office Transfer Requests (Dec. 2016 – Feb. 2017)

Plaintiff's requests, on December 16, 2016, December 30, 2016, and February 22, 2017, for a transfer to the Newburgh Office cannot support a claim for failure to accommodate because Plaintiff has proffered no evidence that these requests were related to his disability.  See Scalera v. Electrograph Systems, Inc., 848 F. Supp. 2d 352, 367 (E.D.N.Y. 2012) (explaining that, to establish a prima facie case of discrimination for failure to make a reasonable accommodation, "[a]ll Plaintiff needs to show is that the requested accommodations were reasonable and connected to [his] disability") (citation omitted)).  It is undisputed that all three of these requests were made on the stated basis that Plaintiff wanted to work closer to home, and Plaintiff has proffered no evidence to the contrary.  (Pl. 56.1 Counter-St. ¶¶ 14, 15, 18; Rosenbaum Decl. Exs. 14, 15, 21.)  As the record contains no evidence that these requests

related to Plaintiff's disability, Plaintiff cannot establish a prima facie case for failure to accommodate on the basis of these requests, even though the requests were not granted.

<u>Requests for Reassignment Away from Harrington</u>

Plaintiff's requests for a reassignment from Harrington's supervision, made verbally to Jeudy sometime in July or August of 2017, verbally to Mechkowski and Jeudy in a meeting on August 14, 2017, and in writing via ICE's reasonable accommodation request form on August 16, 2017, cannot form the basis for a claim for failure to accommodate for three reasons.  First, "it is well-settled that changing an employee's supervisor is generally not a reasonable accommodation."  <u>Wallace v. Wormuth</u>, No. 18-CV-6525-RA, 2022 WL 993064, at *13 n.10 (S.D.N.Y. Mar. 31, 2022) (citing <u>Wernick v. Fed. Reserve Bank of New York</u>, 91 F.3d 379, 384 (2d Cir. 1996)).

Second, even if Plaintiff's requested accommodation was reasonable, Defendants are entitled to summary judgment because it is undisputed that they provided the requested accommodation.  <u>See</u> <u>Corona v. Clarins U.S.A., Inc.</u>, No. 17-CV-4438-JGK, 2019 WL 4393082, at *5 (S.D.N.Y. Sept. 12, 2019) (granting summary judgment for defendants on failure to accommodate claim where "the defendants provided the accommodations that [Plaintiff] requested").  Plaintiff 's own characterization of his requests makes clear that his primary concern was getting away from Harrington, and Plaintiff states explicitly that a transfer to Newburgh was not the only means of accomplishing this goal.  (<u>See</u> Conklin Decl. ¶ 20 (stating, in reference to the July/August verbal requests to Jeudy, "I requested in person and via email that Mr. Jeudy . . . re-assign me so that I would not have to work under Mr. Harrington any longer"); <u>id.</u> ¶ 29 (stating, in reference to the August 14 request, that "[o]n August 14, 2017, during this set meeting, I told my Union representatives . . . and Franz Jeudy and Scott Mechkowski about my

disability and how the stress from Mr. Harrington was affecting my work perf[o]rmance.  I

pleaded with Mr. Mechkowski *to allow me to transfer to a different location, any different*

*location,* to avoid working under Mr. Harrington) (emphasis added); Rosenbaum Decl. Ex. 40

(Plaintiff's reasonable accommodation request form, in which Plaintiff did not specify the nature

of his disability, but stated that a "disability documented prior to hire" was being "aggravated"

by "harassment and hostility" from Harrington and Jeudy).)  It is undisputed that, following

receipt of these complaints, Defendants provided Plaintiff with the accommodation he requested.

On August 14, Plaintiff was transferred to a new supervisor, Smith.  In early September, Plaintiff

was reassigned again, to Hyde.

       Even if Plaintiff were to argue that he did not receive his most preferred

accommodation (a transfer to the Newburgh office), it is undisputed that his request to be

transferred away from Harrington was granted.  "[E]mployers are not required to provide a

perfect accommodation or the very accommodation most strongly preferred by the employee, so

long as the chosen accommodation is effective."  Atencio v. United State Postal Service, 198 F.

Supp. 3d 340, 356 (S.D.N.Y. Aug. 4, 2016).  Here, Plaintiff requested accommodation in the

form of a re-assignment away from Harrington and received such accommodation.

       Finally, Defendants reached out twice to Plaintiff to confirm that this

accommodation was satisfactory, and Plaintiff did not respond, barring recovery by Plaintiff.

"An employee who is responsible for the breakdown of the interactive process [of developing a

reasonable accommodation] may not recover for a failure to accommodate."  Voss, 2021 WL

4199941, at *13 (quotation and alteration omitted).   Plaintiff's requests for re-assignment from

Harrington cannot, for the foregoing reasons, provide grounds for a viable claim of failure to accommodate.[10]

> ### 2018 Requests for Transfer to Newburgh Office

Plaintiff asserts that he applied twice more, in 2018, for transfers to the Newburgh Office, but that those transfers were denied to him and "given to officers with less seniority." (Conklin Decl. ¶ 57.) Plaintiff does not proffer any evidence that he made Defendants aware that this request was related to his disability, instead asserting that "Defendants knew that [Plaintiff] could have benefited medically and work performance wise if placed in these positions prior to [] applying for them . . .. [Plaintiff's] physician had emphasized that the Newburgh office would be a good fit for [him]." (Id.) As to the reason for the denial, Plaintiff asserts that, "upon information and belief, [Plaintiff] was not given these transfers as a way to further retaliate and discriminate against [Plaintiff]."

Even if Plaintiff had established a prima facie case of discrimination as to these transfers, he has failed to rebut Defendants' proffer that Plaintiff was ineligible for a transfer in 2018 because he had been placed on administrative duty. (Defs. 56.1 St. ¶ 55.) If undisputed, this would suffice to rebut Plaintiff's prima facie case of failure to accommodate his requests for a transfer. "Nothing in the ADA requires an employer to abandon its legitimate,

---

[10]     In their 56.1 Statement, Defendants state that Plaintiff also requested a transfer to the Newburgh Office on or around October 3, 2018, while he was hospitalized, but that Plaintiff was ineligible for a transfer due to his placement on administrative duties. (Def. Mem. at 27 n.6.) Plaintiff denies that this constituted a separate transfer request, stating that he only "inquired as to whether he was being transferred to the Newburgh sub-office." (Pl. 56.1 Counter-St. ¶ 55.) As Plaintiff does not contend that this constituted a separate request for accommodation, the Court does not consider whether it provides grounds for a failure to accommodate claim.

nondiscriminatory policies defining job qualifications, prerequisites, and entitlements to intra-company transfers."  Felix v. New York City Transit Authority, 154 F. Supp. 2d 640, 655 (S.D.N.Y. 2001) (citing Dalton v. Subaru-Isuzu Automotive, Inc., 141 F. 3d 667, 678 (2d Cir. 1998)).  Although Plaintiff disputes that his placement on administrative duty rendered him ineligible for a transfer, (Pl. 56.1 Counter-St. ¶ 55 (stating, in response to Defendants' assertion, "denied," and providing no contrary evidence)), the only sworn evidence he proffers in support of this claim is his conclusory assertion, made upon information and belief, that the motivation for the denial was discriminatory and retaliatory.  (Conklin Decl. ¶ 57.)  Such a conclusory proffer fails to raise a genuine issue of material fact as to whether Plaintiff was, in fact, ineligible for a transfer.  See Blake v. Dep't of Developmental Servs., 750 F. App'x. 54, 54 (2d Cir. 2019) ("[T]he non-moving party may not rely on conclusory allegations or unsubstantiated speculation.") (quoting Fujitsu Ltd. v. Fed. Exp. Corp., 247 F. 3d 423, 428 (2d Cir. 2001)); Dimaggio v. Int'l Sports Ltd., No. 97-CV-7767-AKH, 1999 WL 675979, at *2 (S.D.N.Y. Aug. 31, 1999) ("A conclusory allegation . . . alleged, in essence, upon information and belief, is not sufficient to overcome a motion for summary judgment.") (citation omitted).  The Court therefore finds no genuine dispute of material fact as to Defendants' assertion that their legitimate, non-discriminatory transfer policy barred Plaintiff's transfer to the Newburgh Office. As such, no reasonable jury could find the Defendants liable for failure to accommodate on that basis.

Request for Re-assignment from Front Desk

Plaintiff's request for a change in his seating assignment, made to Delgado after he was placed at the reception desk at 201 Varick Street, cannot provide the basis for a failure to accommodate claim because Plaintiff has not demonstrated this request was connected to his

disability.  Plaintiff states that he requested this change in his seating assignment because sitting

at the reception desk made him "emotionally distraught," and that he felt "like a fish in a tank

now and on exhibit since employees and members of the public would constantly ask as to why

[he] was sitting there."  (Conklin Decl. ¶¶ 51, 52 (internal quotation marks omitted).)  No

reasonable jury could find that this constituted a request to accommodate Plaintiff's disability,

rather than his complaint of discomfort about his placement at the reception desk.

        Having liberally construed Plaintiff's non-specific arguments for failure to

accommodate, the Court finds that, even viewing the evidence in the light most favorable to

Plaintiff, no reasonable jury could find that he has established a claim for a failure to

accommodate under the Rehabilitation Act.  Summary judgment is granted as to Plaintiff's

failure to accommodate claim.

Retaliation Claim

        A claim for retaliation is analyzed under the same three-part McDonnell Douglas

burden shifting test, but the elements of the prima facie case for retaliation differ slightly from

those for discrimination.  To establish a prima facie case of retaliation, a plaintiff must

demonstrate that: "(i) [he] was engaged in protected activity; (ii) the alleged retaliator knew that

plaintiff was involved in protected activity; (iii) an adverse decision or course of action was

taken against plaintiff;[11] and (iv) a causal connection exists between the protected activity and

---

[11]    In the context of a retaliation claim, the scope of what constitutes an adverse employment
action is broader than in the disparate treatment claim context.  See Burlington Northern
and Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006) ("We conclude that the
antiretaliation provision does not confine the actions and harms it forbids to those that are
related to employment or occur at the workplace.  We also conclude that the provision
covers those (and only those) employer actions that would have been materially adverse
to a reasonable employee or job applicant.  In the present context that means that the

the adverse action." Natofsky v. City of New York, 921 F.3d 337, 353 (2d Cir. 2019) (citation omitted). "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Id. (citation and internal quotation marks omitted). However shown, the connection must be such that "discrimination was the but-for cause of any adverse employment action." Id. at 348.

If a prima facie case is established, a presumption of retaliation arises. "The defendant must then articulate a non-retaliatory reason for the adverse employment action." Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks and citation omitted). If such a reason is articulated, "the presumption of retaliation dissipates," id., and the employee "must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." Zann Kwan v. Andalex Group LLC, 737 F.3d 834, 845 (2d Cir. 2013) (citing Univ. of Tex. Sw. Med. Ctr. V. Nassar, 570 U.S. 338, 362 (2013)). "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." Id. at 846. "It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 90-91 (2d Cir. 2015) (citation omitted).

---

employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.")

Protected Activity

Plaintiff argues that he engaged in protected activity on the following occasions:

[W]hen he complained to supervisors about discrimination in January, 2017, April, 2017, at least three times between June and August, 2017, on December 11, 2017, between December, 2017, and June, 2018, in June, 2018, on October 1, 2018, and twice between January and December, 2018.  Plaintiff also engaged in protected activity when he filed an EEOC complaint.

(Pl. Mem. at 6.)  He does not provide record citations corresponding to these dates.  As Plaintiff does not specify the activities to which these dates correspond or cite to the evidence in the record, the Court first considers whether these dates correspond with activities for which there is record evidence, and then whether each activity is protected under the Rehabilitation Act.  An activity is protected under the Rehabilitation Act  if it is "action taken to protest or oppose statutorily prohibited discrimination."  <u>Natofsky</u>, 921 F.3d at 354 (citation omitted).

January 2017

Although Plaintiff was transferred to a new unit and supervisor in January 2017 (Conklin Decl. ¶ 8), the record contains no evidence that Plaintiff complained about discrimination at that time.  On the basis of the record before the Court, no reasonable jury could find that Plaintiff engaged in protected activity in January 2017.

April 2017

Plaintiff's complaints to Rodriguez and Muller in April 2017 are not protected activity because Plaintiff proffers no evidence that he was protesting discrimination, rather than appealing a negative performance review.  Plaintiff's statement, that the performance review was not "fair" given that he had confided his condition to Rodriguez, gives no indication that Plaintiff was alleging discriminatory treatment, but instead seems to indicate frustration at not receiving

greater solicitude from Rodriguez on the basis of his disability.  "[A]ppealing a negative

performance review is not a protected activity that can give rise to a retaliation claim."

Natofsky, 921 F.3d at 354 (affirming summary judgment for defendant where the record showed

that plaintiff "was not protesting discrimination in his appeal but offering a defense of why

plaintiff may have been slow in responding to emails").

                  <u>June and August 2017</u>

                  Plaintiff's assertions that he complained to supervisors about Harrington, "at least

three times between June and August, 2017," if true, could be found by a reasonable jury to

constitute protected activity because Plaintiff, in those complaints, alleged violations of the

Rehabilitation Act, namely discrimination and creation of a hostile work environment.

Complaints alleging any violation of the Rehabilitation Act or ADA, whether made formally or

informally, constitute protected activity that can support a claim of employment retaliation.  <u>See,</u>

<u>e.g.</u>, <u>Frantti v. New York</u>, 414 F. Supp. 3d 257, 290-91 (N.D.N.Y. 2019) (citing <u>Vale v. Great</u>

<u>Neck Water Pollution Control Dist.</u>, 80 F. Supp. 3d 426, 439 (E.D.N.Y. 2015)).  This is true even

if the underlying conduct about which the plaintiff complains is lawful, "so long as plaintiff

possessed a good faith, reasonable belief that the challenged action violated the law."  (<u>Id.</u>)

Plaintiff proffers his sworn declaration that "[i]n or about July and August of 2017, I told . . .

Franz Jeudy, about my mood disorder on at least three separate occasions.  I explained to Mr.

Jeudy that I was being discriminated against by Mr. Harrington for being slower than others."

(Conklin Decl. ¶ 20.)  It is undisputed that Plaintiff also sent an email to union officials, on July

25, 2017, complaining about Harrington's conduct (Defs 56.1 St. ¶¶ 29-30) and that, on August

2, 2017, he submitted an email to ICE's Joint Intake Center ("JIC") alleging that Harrington was

creating a hostile work environment and citing examples of alleged harassment.  (<u>Id.</u> ¶ 32.)  If

credited by a jury, Plaintiff's assertions that he communicated formal or informal complaints about either discrimination or creation of a hostile work environment could be found to be protected activity under the Rehabilitation Act.

### December 11, 2017

Plaintiff asserts that, on December 11, 2017, he "met with Assistant Field Office Director Jerome White [('White')] about my mood disorder and the trouble that I had been having over the previous months. I explained the new medications I was prescribed and now took due to the stress and the discrimination I was facing at work." (Conklin Decl. ¶ 45.) Viewing this evidence in the light most favorable to the Plaintiff, a reasonable jury could conclude that this was protected activity in which Plaintiff raised discriminatory treatment to management.

### Between December 2017 and June 2018

Plaintiff's assertion that he engaged in protected activity "between December, 2017 to June 2018, in June 2018" appears to correspond to alleged complaints to Delgado and another supervisor, Robert Sperruggia ("Sperruggia"), about his front desk assignment. In his declaration, Plaintiff states that he "became emotionally distraught" at being placed at the front desk and "discussed [his] concerns with Ms. Delgado." (Conklin Decl. ¶ 51.) This assertion is far too vague, even when construed in the light most favorable to Plaintiff, to make out protected activity such that Plaintiff defeats summary judgment. See, e.g., Hubb v. Suffolk Cnty. Sheriff's Dep't, 788 F.3d 54, 61 (2d Cir. 2015) (explaining that "vague and conclusory statements in [an] affidavit" are insufficient to defeat summary judgment). He also states that, "[i]n or about June, 2018, I told a supervisor, Robert Sperruggia, about my medical disability and how the front desk

assignment was extremely demeaning and constituted a repeated and continuous act of discrimination towards me."  (Conklin Decl. ¶ 52.)  This assertion is far more specific and, construed in the light most favorable to Plaintiff, could lead a reasonable jury could conclude that Plaintiff's statements to Sperruggia constitute a complaint about discrimination, which is protected activity under the Rehabilitation Act.

### October 1, 2018

On October 1, 2018, Plaintiff reported to Delgado that someone was leaving a newspaper he found objectionable on his desk and changing his computer screen saver to "inappropriate images."  (Conklin Decl. ¶¶ 55-56.)  Plaintiff, who identifies as heterosexual, believed the newspaper was left at his desk "with the intent to harass him, and possibly in retaliation for his filing an ODCR complaint" in December 2017.  (Pl. 56.1 Counter-St. ¶ 64.) Construed in the light most favorable to Plaintiff as the non-moving party, a reasonable jury could conclude that Plaintiff was reporting activity that he believed was retaliation taking place in violation of the Rehabilitation Act.  Such a report is protected activity under the RA.

### Between January and December of 2018

Plaintiff asserts that he engaged in protected activity twice between January and December of 2018.  As best the Court can ascertain, this refers to Plaintiff's twice applying for transfers to the Newburgh Office, transfers that he claims "Defendants knew [would] have benefited [Plaintiff] medically and work performance wise if placed in these positions . . . as when Plaintiff requested my reasonable accommodation."  (Conklin ¶ 57.)  Although Plaintiff's phrasing is unclear, a reasonable jury could, construing the assertions in the light most favorable to Plaintiff as the non-moving party, understand these transfer requests as a request for

accommodation for his disability.  Such requests are protected activity under the Rehabilitation Act.  See Atencio, 198 F. Supp. 3d at 362.

Finally, Plaintiff states that he engaged in protected activity "when he filed an EEOC complaint."  Plaintiff filed a complaint with the EEOC on April 5, 2018 (Rosenbaum Decl. Ex. 66 (email from EEOC)), which is a protected activity under the Rehabilitation Act. See, e.g., Sivio v. Village Care Max, 436 F. Supp. 3d 778, 801 (S.D.N.Y. Jan. 31, 2020) (explaining that filing an EEOC complaint is a protected activity under the ADA, RA, and Title VII).  His amendments to this complaint, made on June 15, 2018, August 3, 2018, November 7, 2018, and November 23, 2018 (Defs. 56.1 St. ¶ 62), are likewise protected activities under the RA.

Adverse Actions

Plaintiff asserts, without citation to the evidentiary record, that he suffered adverse actions at the following times, with the claimed temporal proximity to a protected activity in accompanying parentheticals:

> Here, Defendant suffered adverse action, inter alia, on April 2017 (2 months after a protected activity), July 2017 (same month), August 2, 2017 (same day), August 14, 2017 (same month), November 2017 (within 4- months), December 2017 (same month), June 15, 2018 (same month), twice between January 2018 and December 2018 (anywhere within the same 11-month period), May 2019 (possibly within 5 months and no longer than 7 months).

(Pl. Mem. at 7.)   As Plaintiff does not specify the adverse actions referenced here, or the corresponding protected activity, the Court first considers whether these dates correspond with adverse action taken against Plaintiff, and then whether there is a sufficient factual basis for an inference that a causal connection exists between any of the above-referenced protected activities and the adverse action itself.

### April 2017 Performance Review

In April 2017, Plaintiff received a negative performance review, which the Court presumes is the adverse action to which Plaintiff refers.  The negative performance review cannot form the basis of a retaliation complaint because the record is insufficient to support a finding that Plaintiff engaged in any protected activity prior to April 2017.  See Conway v. Healthfirst, Inc., No. 21-CV-6512-RA, 2022 WL 4813498, at *5 (S.D.N.Y. Sept. 30, 2022) ("[B]ecause the alleged adverse employment action occurred before the protected activity, Plaintiff cannot sustain a claim for retaliation on these grounds.") (citation omitted).

### July 2017 Actions by Harrington

On July 25, 2017, the day after his return from the LESC in Vermont, Plaintiff complained that Harrington had relocated Plaintiff's desk directly in front of Harrington's office and placed a stack of case files on Plaintiff's desk.  Plaintiff alleges that the protected activity underlying these allegedly retaliatory actions took place in the "same month."  While the Court has found that these complaints constitute protected activity, no reasonable jury could find a causal link between this activity and Harrington's actions, because the actions necessarily preceded Plaintiff's complaints about them. As such, Plaintiff has failed to meet the causation element of a prima facie case for retaliation, and a claim based on activity from these dates cannot survive summary judgment.  Moy v. Perez, 712 F. App'x 38, 40 (2d Cir. 2017) (finding that an adverse employment action could not sustain a retaliation claim because plaintiff "does not allege prior participation in a protected activity").

<u>August 2, 2017 Call from Jeudy</u>

Plaintiff's reference to "August 2, 2017 (same day)" appears to reference Plaintiff's email to ICE's JIC Office complaining about Harrington's conduct and, as best the Court can ascertain, a phone call shortly thereafter from Jeudy "threaten[ing] that [Plaintiff] must report the next day . . . for discipline" and that Plaintiff "had no business reporting the incidents outside of his chain of command."  (Conklin Decl. ¶ 27.)  Viewing the evidence in the light most favorable to Plaintiff, the Court finds that he has made a demonstration of retaliation sufficient to survive summary judgment.

The first two elements of a prima facie case are satisfied, as Plaintiff's email complaining about Harrington is protected conduct, and Jeudy's statement that Plaintiff had been "reporting incidents outside of his chain of command" satisfies the requirement that Jeudy be aware of the conduct.  The third element is met because Jeudy's alleged actions could dissuade a reasonable worker bringing a protected complaint of discrimination by superiors.  "In the context of a retaliation claim, an adverse employment action is any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination."  <u>Atencio</u>, 198 F. Supp. 3d at 362 (quoting <u>Vega v. Hempstead Union Free School Dist.</u>, 801 F. 3d 72, 90 (2d Cir. 2015) (internal quotation marks omitted)).   A threat to bring discipline that is explicitly attached to a Plaintiff's efforts to bring a complaint against management could certainly dissuade a reasonable worker from bringing such a complaint.  As to causation, Plaintiff has met his burden as well – both the short temporal proximity between Plaintiff's protected activity and the content of Jeudy's alleged statements constitute evidence that his statements were caused by Plaintiff's filing of a grievance against Harrington to the JIC.  While it is unclear whether Defendants dispute Plaintiff's factual assertions, because the declaration in which they are contained was

filed contemporaneously with Plaintiff's opposition, Plaintiff has, at a minimum, raised genuine issues of material fact as to whether a prima facie case for retaliation exists as to Jeudy's alleged statements on August 2, 2017.

This shifts the burden to Defendants, who must articulate a non-retaliatory reason for the adverse employment action.  See Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (explaining that, if a Plaintiff sustains the initial burden of a prima facie case of retaliation, "[t]he defendant must then articulate a non-retaliatory reason for the adverse employment action") (internal quotation marks and citation omitted).  Defendants, in their reply, fail to address Plaintiff's allegations regarding the events of August 2, 2017.  The Court therefore finds that a reasonable jury could, on the record before it, find Plaintiff has established a claim for retaliation on the basis of the events of August 2, 2017.  Defendants' motion for summary judgment is denied insofar as it relates to alleged retaliatory conduct committed by Jeudy on August 2, 2017.

August 14, 2017 Meeting

On August 14, 2017, Plaintiff met with union representatives, Jeudy, and Mechkowski to request a transfer to a new location in order to "get away from Mr. Harrington." (Defs. 56.1 St. ¶¶ 35-36; Conklin Decl. ¶ 29.)  Plaintiff alleges in his declaration that "Mechkowski laughed as he became seemingly amused by my disclosures.  Mr. Mechkowski further boasted that he had more consecutive time accumulated while under personal investigation by the agency than plaintiff's actual tenure as a government employee.  Mr. Mechkowski added that [Plaintiff] had a lot to learn about how 'business is conducted here', meaning how business is conducted at ICE."  (Conklin Decl. ¶ 30.)  Plaintiff's claim fails because he does not identify an adverse employment action that took place on that date. Mechkowski's alleged response does not rise to the level of an adverse employment action.  See

Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010) ("Petty slights or minor annoyances that often take place at work and that all employees experience do not constitute actionable retaliation.") However upsetting Mechkowski's reaction may have been to Plaintiff, no reasonable jury could find that it constituted a "materially adverse action" that altered Plaintiff's conditions of employment.  Indeed, the meeting achieved Plaintiff's stated goal, as he was reassigned to a new supervisor that same day.

    November 2017 Performance Review

        In November 2017, Plaintiff received a negative performance evaluation from Harrington, which can constitute an adverse action for purposes of a retaliation claim, thus satisfying the third element of a prima facie case.  See Smith v. New York City Dep't of Ed., 18-CV-8545-PGG, 2019 WL 6307471, at *11 (S.D.N.Y. Nov. 25, 2019) ("It is well established that a negative performance review can constitute an adverse action for purposes of a retaliation claim, even though this conduct would not support a charge of discrimination.") (internal quotation marks and citation omitted).  Plaintiff alleges that the protected activity took place "four months earlier," presumably a reference to his filing of a complaint regarding Harrington with JIC, which resulted in an investigation into Harrington's conduct.  As noted, such activity is protected under the Rehabilitation Act, satisfying the first element.  The four-month gap between the protected activity and the adverse employment action is, at the prima facie stage, sufficiently brief to support an inference of causation.  Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship.") (citation omitted).  However, Plaintiff's claim fails because he has not alleged, let

alone demonstrated, that Harrington was aware, in November 2017, of Plaintiff's complaints

against him.  Harrington did not attend Plaintiff's August 2, 2017, meeting with Jeudy regarding

Plaintiff's complaints against him and ODCR's internal investigation into Harrington's conduct

did not begin until March of the following year.  Although the burden of production at the prima

facie stage is low, it must still be met by Plaintiff.  As Plaintiff has failed to articulate the basis

on which Harrington would have been aware of the protected activity, or evidence in support of

the same, no reasonable jury could find on this record that Plaintiff's negative November

performance review supports a claim for retaliation.

<u>December 2017 Placement on Limited Duty</u>

Although it is undisputed that Plaintiff was reassigned to administrative/limited

duty on September 11, 2017 (Defs. 56.1 St. ¶ 49), Plaintiff states in his declaration that White

informed him of his placement on limited duty on December 2017.  On this basis, the Court

interprets the adverse employment action Plaintiff ascribes to December 2017 as this

reassignment to limited duty.  Without question, reassignment to limited duty – which included

suspension of Plaintiff's weapon, badge, and security credentials, and deprived Plaintiff of the

ability to earn administrative uncontrollable overtime or eligibility for certain transfers –

constituted an adverse employment action for purposes of a retaliation claim.  However, Plaintiff

cannot establish that any protected activity[12] was the but-for cause of his placement on

administrative duty, because he does not dispute that his placement was "as a result of the

---

[12]     Plaintiff states that he engaged in some protected activity that "same month," but it is
unclear what protected activity Plaintiff is referring to.  If he is referring to his December
11, 2017, statements to White regarding discrimination, <u>supra</u> at 38, these statements
cannot satisfy the protected activity element of a retaliation claim based on Plaintiff's
placement on limited duty, as it is undisputed that the decision to place Plaintiff on
limited duty was made in September 2017.

incidents that took place on September 9 and 10 and in accordance with ICE policy." (Pl. 56.1 Counter-St. ¶ 49 ("On September 11, 2017, as a result of the incidents that took place on September 9 and 10 and in accordance with ICE policy, ICE suspended Plaintiff's weapon, badge, and credentials, and placed Plaintiff on administrative duty . . . Plaintiff's Response: Admitted.").) As it is undisputed that the protected activity was not the but-for cause of Plaintiff's placement on administrative duty, a retaliation claim on the basis of this action cannot survive summary judgment.

At the same time, Delgado assigned Plaintiff to work at the front desk of 201 Varick. Defendants assert, and Plaintiff disputes, that Plaintiff was placed at the front desk, rather than a normal workstation, "because the internal investigation was still pending." (Pl. 56.1 Counter-St. ¶ 59.) Plaintiff argues that "Defendants directly evidenced a causal connection to Plaintiff's protected activities . . . when a senior deportation officer stated Plaintiff's mistreatment was what happens when you speak out against management." (Pl. Mem. at 7.) However, even if Plaintiff has made out a prima facie case of retaliation on the basis of this statement and temporal proximity, he has failed to rebut Defendants' nondiscriminatory basis for the reassignment – namely that, while on administrative duty, Plaintiff was barred from doing much of the normal work of a Deportation Officer. Plaintiff's conclusory assertion that, upon information and belief, his re-assignment was "done to further discriminate" against him (Conklin Decl. ¶ 50), is insufficient, even viewing the record in the light most favorable to him as the non-moving party, to enable this claim to survive summary judgment.

### 2018 Newspaper and Computer Screen Incidents

On June 15, 2018, a newspaper entitled "Gay City News" was left in the front desk of 201 Varick St., Plaintiff's work area, which was a shared space. (Pl. 56.1 Counter-St. ¶

63.)  Plaintiff asserts that this happened at least three more times.  (Conklin Decl. ¶ 55.)  Plaintiff further asserts that his computer screen saver was "changed to inappropriate images if [Plaintiff] left his computer unattended."  (Id.)  Plaintiff states that he told Delgado about the conduct and "felt as if [Plaintiff] was being retaliated against for filing an EEOC Complaint."  (Id. ¶ 56.) Delgado reported the incident to JIC (Rosenbaum Decl. Ex. 29 at 1) which, upon investigation, interviewed another deportation officer who admitted that the newspaper was his.  (Pl. 56.1 St. ¶ 65.)

Here, Plaintiff's claim for retaliation cannot survive summary judgment because a co-worker leaving a newspaper in a shared work area, even if Plaintiff finds the content objectionable, does not constitute an adverse employment action.  Regarding the images, Plaintiff fails to proffer sufficient evidence to state a prima facie case of retaliation.  He has made no proffer as to the content of the images, other than to state that they were "inappropriate," and no proffer as to who may have been responsible for the images or how the responsible party might have been aware of Plaintiff's EEOC complaint.  As such, no reasonable jury could find the elements of a prima facie case for retaliation to be made out with respect to his newspaper/screen saver complaints.

### "Twice Between January 2018 and December 2018"

As best the Court can ascertain, Plaintiff is here referring to his twice being denied transfers to the Newburgh Office.  He does not specify the date of the protected activity, instead writing, in the corresponding parenthetical, "anywhere within the same eleven-month period."  The Court cannot ascertain which protected activity Plaintiff believes caused him to be denied a transfer.  In his declaration, Plaintiff states only that "[u]pon information and belief, I was not given these transfers as a way to further retaliate and discriminate against me."  (Conklin

Decl. ¶ 57.)  Without alleging a specific protected activity or theory of causation, Plaintiff cannot persuade a reasonable jury that he has established a prima facie case of retaliation.

<u>May 2019 Reassignment</u>

Plaintiff asserts that, in May 2019, he was "assigned back in the same work area as Mr. Harrington."  (Conklin Decl. ¶ 58.)  Plaintiff asserts that "this was done to further harass [him] and cause [him] anxiety."  (<u>Id.</u> ¶ 59.)  Regarding the protected activity, Plaintiff states only that it took place "possibly within five months and no longer than 7 months."  (Pl. Mem. at 7.) Even assuming, <u>arguendo</u>, that this placement constitutes an adverse employment action, Plaintiff does not identify with certainty the date range in which the protected activity occurred, rendering the Court unable to reliably identify the protected activity to which Plaintiff refers. Nor does Plaintiff put forward any proffer as to who re-assigned him to this new work location, making it impossible for the Court to determine who the alleged retaliator was or whether that person was aware of the protected activity underlying Plaintiff's claim.  Here, no reasonable jury could find that Plaintiff has made out a prima facie case of retaliation.

For the foregoing reasons, Defendants' Motion for Summary Judgment, insofar as it relates to Plaintiff's claims for retaliation, is denied with respect to the August 17, 2017, call from Jeudy to Plaintiff.  The motion is granted as to all other aspects of Plaintiff's retaliation claims.

<u>Hostile Work Environment</u>

"To establish a hostile work environment claim, a plaintiff must produce evidence that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment.'" Toombs v. New York Cty. Hous. Auth., No. 16-CV-3352-LTS,

2019 WL 4039528, at *8 (S.D.N.Y. Aug. 27, 2019) (quoting Harris v. Forklift Sys., Inc., 510

U.S. 17, 21 (1993)). "As a general rule, incidents must be more than episodic; they must be

sufficiently continuous and concerted in order to be deemed pervasive." Alfano v. Costello, 294

F. 3d 365, 374 (2d Cir. 2002) (internal quotation marks and citation omitted). "Mistreatment,

however severe, does not constitute a Title VII violation without evidence that Plaintiff's

protected characteristic was the reason for the treatment." Toombs, 2019 WL 4039528, at *8

(citing Alfano v. Costello, 294 F.3d 365, 377-78 (2d Cir. 2002)). "In determining whether a

work environment is hostile, [the] Court must consider the totality of the circumstances, which

includes (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is

threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably

interferes with an employee's work performance." Gamble v. Fieldston Lodge Nursing and

Rehab. Ctr., No. 20-CV-10388-LTS, 2022 WL 1778488 (S.D.N.Y. Jun. 1, 2022) (quoting Reyes

v. Westchester Cty. Health Care Corp., No. 21-0410, 2021 WL 4944285, at *3 (2d Cir. Oct. 25,

2021)) (internal quotation marks omitted).

   The burden of establishing the existence of a hostile work environment is heavy,

but it should not be insurmountable:

> While the standard for establishing a hostile work environment is high, we
> have repeatedly cautioned against setting the bar too high, noting that
> while a mild, isolated incident does not make a work environment hostile,
> the test is whether the harassment is of such quality or quantity that a
> reasonable employee could find the conditions of [his] employment
> *altered for the worse*.

Terry v. Ashcroft, 336 F. 3d 128, 148 (2d Cir. 2003) (quoting Whidbee v. Garzarelli Food

Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000) (internal alterations and quotation marks

omitted).

It is unclear exactly over what time period, and under which supervisor, Plaintiff alleges that he suffered a hostile work environment.  In his opposition, Plaintiff argues that:

> Plaintiff alleges repeated incidents of severe/pervasive harassment: Plaintiff's supervisors continually humiliated him, yelled at him, frequently looked Plaintiff in the eye in a threatening manner, physically hurled a projectile at him, and assigned onerous tasks and protocols to Plaintiff that altered the conditions of his employment.

(Pl. Mem. at 11.)  Most likely, Plaintiff is referring to his experience working under the supervision of Harrington, whom he accuses of much of the conduct generally referred to here, including yelling, throwing a book at Plaintiff (or in Plaintiff's presence), loudly mocking his disability, and "continuously star[ing] and stand[ing] over" Plaintiff during the day.  (Conklin Decl. ¶ 14.)  In ODCR's internal investigation into Harrington's conduct towards Plaintiff, ODCR found that "Harrington used rude, unprofessional, or similarly inappropriate language in proximity" of Plaintiff.[13]  (Rosenbaum Decl. Ex. 32.)  Such conduct, if it took place and was a reaction to Plaintiff's disability, could be found by a reasonable jury to have created an objectively hostile or abusive work environment.

Defendants argue that Plaintiff cannot show that Harrington's hostility was based on Plaintiff's disability because Harrington was unaware of the disability.  However, Plaintiff, in his declaration, states that Harrington repeatedly made derogatory comments regarding Plaintiff's disability, and that Plaintiff told Harrington of his disability on multiple occasions. There is therefore a triable issue of fact as to whether Harrington was aware of Plaintiff's

---

[13]   The ODCR found the charge of a hostile work environment to be "unsubstantiated," but reached this conclusion not because it found that Harrington's behavior fell short of the hostile work environment standard, but on the basis of its finding that"[n]either any of the witnesses nor [Plaintiff] that the alleged offensive acts were associated with [Plaintiff]'s membership in a protected class."  (Rosenbaum Decl. Ex. 32)

disability and, if so, whether the treatment was the product of animus based on Plaintiff's disability.

For these reasons, Defendants' Motion for Summary Judgment is denied insofar as it is directed to Plaintiff's hostile work environment claim.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment (docket entry no. 56) is granted as to Plaintiff's First (Discrimination Based on Disability) and Fourth (Failure to Accommodate) Causes of Action.  It is denied as to the Second Cause of Action (Hostile Work Environment) and is denied with respect to the aspect of the Third Cause of Action (Retaliation) based on the call Plaintiff received from Jeudy on August 2, 2017, and is granted with respect to all other aspects of the Third Cause of Action.  This Memorandum Opinion and Order resolves docket entry no. 56.

This case has been referred to Magistrate Judge Cott for general pretrial management.  The parties must promptly contact Judge Cott's chambers to request a settlement conference and to address what, if any, pretrial matters remain outstanding if settlement of all outstanding issues cannot be achieved.

SO ORDERED.

Dated: March 16, 2023
New York, New York

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge